# United States Court of Appeals
## For the First Circuit

No. 25-1880

EDUARDO TAYLOR,

Plaintiff, Appellant,

v.

HUNG CAO,* Acting Secretary of the Navy,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Dunlap, Lynch, and Kayatta,
Circuit Judges.

Dane Robert Voris, with whom Michael John McMahon, Matthew Oliver, and Cooley LLP were on brief, for appellant.
Nicole M. O'Connor, Assistant United States Attorney, with whom Leah B. Foley, United States Attorney, was on brief, for appellee.

July 7, 2026

---

* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Acting Secretary of the Navy Hung Cao is automatically substituted for former Secretary of the Navy John C. Phelan as appellee.

**LYNCH**, **Circuit Judge**. Eduardo "Ed" Taylor appeals from an order of the United States District Court for the District of Massachusetts granting Defendant-Appellee the Secretary of the Navy's cross-motion for summary judgment and denying Taylor's motion for summary judgment. The district court upheld the denial by the Board for Correction of Naval Records (the "Board" or "BCNR") of Taylor's application in 2022 to upgrade his 1986 discharge from the Marine Corps from "Other Than Honorable" to "Honorable." Taylor argues that the Board failed to apply Department of Defense ("DOD") guidance concerning veterans suffering from post-traumatic stress disorder ("PTSD") and other mental health conditions and failed to adequately explain its decision. He further contends that the district court employed an overly deferential standard of review.

On de novo review, we reject Taylor's challenge to the BCNR's decision and affirm the district court's order.

**I.**

We recount the following facts from the administrative record before the Board. Taylor, who is African American, spent large portions of his upbringing in Medford, Massachusetts, where he experienced significant racial hostility, including the murder of a close friend by a local white gang. Following his high school graduation in 1981, he served for over two years in the National Guard. On December 22, 1983, he enlisted in the United States

- 2 -

Marine Corps (the "Marine Corps"). In 1984, he graduated from Marine bootcamp as the "Honorman," or outstanding recruit in his platoon. He completed the Amphibious Assault Vehicle Training ("Amtrac") Program and was assigned to Company C, 3d Assault Amphibian Battalion, 1st Marine Division, at Camp Pendleton in California ("Charlie Company") as an Amtrac crewman.

In his Marine Corps enlistment application, Taylor acknowledged he had experimentally used marijuana during his Guard service and had been arrested once for disorderly conduct. His command was notified in February 1984 that he had a positive urinalysis from December 1983. The command chose not to discipline Taylor because the positive test was around the time of his initial enlistment. Instead, he was notified of the Marine Corps drug policy.

While serving in Charlie Company, Taylor experienced racial discrimination and harassment. He began to abuse alcohol to cope with these traumatic experiences. During this period, Taylor received three "non-judicial punishments" ("NJPs").[1] First, on August 7, 1984, he received an NJP for "disrespectful language" after an incident in which he insulted a corporal. Taylor's December 2022 application stated that he believed he was targeted

_____

[1] A "non-judicial punishment" may be administratively imposed by a commanding officer "for minor offenses without the intervention of a court-martial." 10 U.S.C. § 815(b).

based on his race when the white corporal ordered him to sweep a floor despite an ankle injury that impeded Taylor's ability to walk. On February 12, 1986, Taylor received an NJP for two specifications of assault after entering into a physical altercation with two lance corporals while he was intoxicated. Taylor, who had known both men since bootcamp and was friends with one, in his application characterized the incident as a "scuffle" leaving "no hard feelings." According to a sworn statement submitted at Taylor's discharge proceedings, the incident also involved a woman who was present and used a racial slur against Taylor. On May 30, 1986, Taylor received a third NJP on charges of conspiring to wrongfully appropriate and wrongfully appropriating a stereo. The Marine who implicated Taylor in the theft later recanted his statement. This recantation was considered by the Navy before Taylor was discharged. Taylor did not appeal any of these NJPs.

In addition, Taylor was formally counseled four times between July 1985 and April 1986, first for poor judgment, then for lack of professionalism and professional deficiencies, and finally for driving while intoxicated.

In February 1986, Taylor was arrested for driving under the influence after he crashed his car on base in Camp Pendleton. His base driving privileges were suspended, but nonetheless he continued to drive on base, was caught, and received a disciplinary

citation on May 14, 1986.  In June 1986, he tested positive for cocaine in a urinalysis.  In his application for correction of his military record, he denied intentionally using cocaine, arguing that he might have smoked a cigarette laced with the substance. The positive urinalysis and Taylor's violation of the base's driving rules were referred to summary court martial proceedings. On July 24, 1986, Taylor was found not guilty of using cocaine but guilty of driving without privileges.

Taylor was then transferred to a new command, Company A, 3d Assault Amphibian Battalion, 1st Marine Division ("Alpha Company"), where he faced no racial incidents, performed successfully, and did not incur any disciplinary charges.  On September 15, 1986, shortly after Taylor's transfer to Alpha Company, the Marine Corps initiated separation proceedings.  The Corps cited Taylor's "pattern of misconduct" based on his three NJPs and his summary court martial conviction.  As part of the separation proceedings, Taylor underwent a physical examination, in which he denied experiencing challenges with his mental health. He acknowledged his alcohol problem and requested treatment.

Members of the naval service may receive one of three administrative discharge characterizations relevant here: (1) "Honorable," which is "contingent upon proper military behavior and performance of duty"; (2) "Under Honorable Conditions" or "General Discharge," which constitutes service "not

sufficiently meritorious to warrant an Honorable Discharge"; and (3) "Under Other Than Honorable Conditions." 32 C.F.R. § 724.109(a). On December 4, 1986, Taylor was discharged with an Other Than Honorable characterization of his service. During his time in the National Guard and the Marine Corps, he was never deployed abroad and never served in active combat.

Following his service, Taylor returned to Massachusetts, where he worked as a plumber for twelve years and eventually started his own plumbing business. After a series of personal losses in the 2000s, Taylor struggled with drug and alcohol abuse and by 2020 had lost his job and home. He sought treatment for his alcohol use and achieved sobriety. While attending treatment, he began receiving therapy and was later diagnosed with PTSD sometime between 2020 and 2022.

## II.

The Secretary of a military department "may correct any military record of [that] . . . department when the Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1). Such corrections are generally made "through boards of civilians" within the military department. Id. For the Department of the Navy, the Secretary has established the BCNR, which consists of civilian members of the Department of the Navy. 32 C.F.R. § 723.2(a). The BCNR considers applications to determine whether there is an "error or injustice in the naval

records of current and former members of the Navy and Marine Corps" and may "make recommendations to the Secretary or . . . take corrective action on the Secretary's behalf when authorized." Id. § 723.2(b). "Applications for correction" must generally be filed "within [three] years after discovery of the alleged error or injustice," though the Board may excuse an untimely filing if doing so "would be in the interest of justice." 32 C.F.R. § 723.3(b); see 10 U.S.C. § 1552(b).

Congress has codified additional procedures for a subset of discharge review claims involving PTSD or traumatic brain injury. Those procedures apply when a former service member seeks "review of a discharge or dismissal" and the claim is "based in whole or in part on matters relating to [PTSD] or traumatic brain injury," and the PTSD or traumatic brain injury "is related to combat or military sexual trauma, as determined by the Secretary concerned." 10 U.S.C. § 1552(h)(1). For those claims, the Board must review medical evidence presented by the claimant and must "review the claim with liberal consideration" to whether PTSD or traumatic brain injury "potentially contributed to the circumstances resulting in the discharge or dismissal or to the original characterization of the . . . discharge or dismissal." Id. § 1552(h)(2). When reviewing a claim covered by subsection (h), the Board must also "seek advice and counsel" from "a psychiatrist, psychologist, or social worker with training on

mental health issues associated with [PTSD] or traumatic brain injury or other trauma as specified in the current edition of the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association." Id. § 1552(g)(2).

Taylor expressly acknowledges that his PTSD diagnosis is unrelated to combat or military sexual trauma and so disclaims reliance on § 1552(h)'s codified "liberal consideration" procedures. He argues instead that applicable DOD memoranda required the Board to give liberal and special consideration to two aspects of his discharge upgrade application: whether his PTSD and major depressive disorder existed during his Marine Corps service, and whether those conditions excused or mitigated the misconduct that led to his Other Than Honorable discharge. The Board here stated that it considered Taylor's application under three such DOD memoranda: the Hagel, Kurta, and Wilkie Memoranda. We take them in turn.

First, on September 3, 2014, then Secretary of Defense Chuck Hagel issued guidance regarding discharge upgrade requests by veterans claiming previously unrecognized PTSD. The "Hagel Memorandum" recognized that PTSD was not understood or diagnosed during earlier periods of service and that, in many cases, "diagnoses were not made until decades after service was completed." The memorandum explained that this history had made it "extremely difficult" for veterans to document either the

existence of PTSD at the time of service or a nexus between PTSD and the in-service misconduct underlying an Other Than Honorable discharge. The memorandum instructed boards to "fully and carefully consider every petition based on PTSD" and to give "[l]iberal consideration" to "petitions for changes in characterization of service to Service treatment record entries which document one or more symptoms . . . which meet the diagnostic criteria of [PTSD] or related conditions." In particular, the memorandum said boards should give "liberal consideration" to a later "finding that PTSD existed at the time of service."

On August 25, 2017, then Acting Undersecretary of Defense Anthony M. Kurta issued clarifying guidance for discharge review boards and correction boards reviewing requests for discharge relief "due in whole or in part to mental health conditions, including [PTSD]." The "Kurta Memorandum" instructs that, "[a]bsent clear evidence to the contrary, a diagnosis rendered by a licensed psychiatrist or psychologist is evidence [that a] veteran had a condition that may excuse or mitigate the discharge." The memorandum also states that "[c]onditions or experiences that may reasonably have existed at the time of discharge will be liberally considered as excusing or mitigating the discharge." It cautions, however, that "[i]n some cases, the severity of misconduct may outweigh any mitigation from mental

health conditions, including PTSD," and that "[l]iberal consideration does not mandate an upgrade."

Finally, on July 25, 2018, then Undersecretary of Defense Robert L. Wilkie issued guidance concerning equity, injustice, and clemency determinations by discharge review boards and correction boards. The "Wilkie Memorandum" provides standards for determining whether relief, including a discharge upgrade, is warranted on "equity, injustice, or clemency" grounds. It states that "[r]equests for relief based in whole or in part on a mental health condition, including [PTSD] . . . should be considered for relief on equitable, injustice, or clemency grounds whenever there is insufficient evidence to warrant relief for an error or impropriety." It also directs boards to consider, among other factors, any "aggravating and mitigating facts related to the record." The memorandum reinforced that DOD "guidance does not mandate relief" and leaves "[t]he relative weight" of its principles "within the sound discretion of each board," while also instructing boards to consider the "military custom and practice" of "punish[ing] only to the extent necessary, . . . rehabilitat[ing] to the greatest extent possible, and . . . favor[ing] second chances" where appropriate.

## III.

By letter dated December 1, 2022, Taylor submitted through counsel an application to the BCNR seeking, among other

things, "to upgrade [his] character of service from Other than Honorable to Honorable." Taylor primarily argued that his Other Than Honorable discharge was "inequitable because it resulted from conduct caused by undiagnosed PTSD and [major depressive disorder]." He noted that, since his 1986 discharge, "military programs and regulations concerning mental health and administrative discharge" have become "far more favorable" and more comprehensive for service members. He also argued that his "overall exemplary service" and meritorious "post-service conduct" "further justif[ied] an upgrade to his unjust [Other Than Honorable] discharge."

In support of his application, Taylor submitted an assessment report by Sandra A. Dixon, a licensed psychologist, dated December 1, 2022. Before preparing her report, Dr. Dixon conducted video interviews with Taylor, administered a diagnostic assessment tool for PTSD, and reviewed his medical and military personnel records. She concluded that Taylor did not meet the criteria for PTSD or major depressive disorder in June 1984 while stationed at Camp Pendleton but did meet the criteria for both diagnoses by "May 1986 while stationed at Camp Pendleton after experiencing multiple traumatic events." She found that "[a]t some point" during his service, "in response to [Taylor] experiencing multiple traumatic incidents of racism, he began to have significant trauma responses." Dr. Dixon also concluded

- 11 -

that, at the time of the assessment, Taylor met "the criteria for the diagnosis of PTSD, at a severe level, and has done so since discharge from the U.S. Marine Corps." She stated that his "PTSD directly contributed to his abuse of alcohol and pattern of misconduct." Dr. Dixon's report also concluded that there was a "nexus" between Taylor's mental health disorders and the misconduct that led to his discharge. This section of her report did not separately examine each incident of misconduct, but generally concluded that, as Taylor "was struggling with PTSD symptoms, . . . his functioning began to deteriorate."

As part of its review, the Board referred Taylor's application to a Navy licensed clinical psychologist, Dr. Molly Summers, for an advisory opinion. Dr. Summers concluded that it was "possible that some of [Taylor's] misconduct could be attributed to undiagnosed symptoms of PTSD or depression"; that it was "plausible that his alcohol use may have increased and become more problematic in the context of stressors during military service"; and that it was "possible that assault and disrespectful language could be attributed to unrecognized symptoms of irritability associated with PTSD." But she reasoned that not all of Taylor's misconduct could be attributed to his mental health diagnoses. First, Dr. Summers noted that Taylor had acknowledged pre-enlistment substance use and had a positive urinalysis in December 1983, before the period in which he claimed to have

incurred PTSD and major depressive disorder.  Second, she stated that Taylor "denie[d] the charges of theft and cocaine usage, [so] that misconduct c[ould] not be attributed to a mental health condition."

On April 13, 2023, Taylor's counsel responded to Dr. Summers's advisory opinion.  Counsel argued that Dr. Summers understated the connection between Taylor's PTSD and his in-service misconduct and neglected to take into account his accomplishments during his military service.  Taylor's counsel also argued that although Taylor had denied the charges of theft and cocaine usage, "[c]ontrary to the Opinion, if those incidents evidence anything, it is that [Taylor's] untreated PTSD and MDD -- along with his efforts to self-medicate the same -- caused him to put himself in situations that he otherwise would not have, even if he was ultimately cleared of any wrongdoing."

On May 2, 2023, the Board denied Taylor's application. In its decision letter, the Board stated that it had "carefully considered all potentially mitigating and/or extenuating factors to determine whether the interests of justice warrant relief in [Taylor's] case in accordance with the Kurta, Hagel, and Wilkie Memos."  The Board noted that it had considered among those factors Taylor's "contention that [he was] struggling with undiagnosed mental health issues caused by racial harassment," "the impact that [his] mental health had on [his] conduct during service," and

his "assertion that [he was] self-medicating with alcohol." The Board acknowledged the evidence that Taylor had provided in support of his PTSD diagnosis, including Dr. Dixon's report, his Department of Veterans Affairs treatment progress notes, and a disability benefits questionnaire referencing his PTSD diagnosis. It also considered Dr. Summers's advisory opinion and Taylor's response to that opinion, including his arguments about the mitigating factors for his various incidents of misconduct. The Board found that "the potentially mitigating factors were insufficient to warrant relief" in light of the "seriousness of [Taylor's] misconduct and the fact that it involved assault and a DUI." The Board noted that Taylor "attribute[d] most of [his] misconduct to drinking or being drunk at the time the misconduct was committed." Ultimately, the Board "concluded that at least some of [Taylor's] misconduct was not due to mental health-related symptoms, rather, was intentional and demonstrate[d]" that he was "unfit for further service."

On June 6, 2024, Taylor filed a complaint against then Secretary of the Navy Carlos Del Toro in the District Court for the District of Massachusetts. Taylor argued that the Board erred in rejecting his service characterization upgrade, and he requested either an injunction directing "the BCNR to correct [his] record in accordance with his December 5, 2022 petition for a discharge upgrade," or an order "hold[ing] unlawful and set[ting]

- 14 -

aside the BCNR's May 2, 2023 decision and remand[ing] with instructions to review [his] BCNR petition in accordance with the Hagel, Kurta, and Wilkie Memos and all other applicable laws."

On December 20, 2024, Taylor moved for summary judgment pursuant to Federal Rule of Civil Procedure 56, requesting that the Court "remand this case to the Board . . . with instructions to consider [Taylor's] discharge-upgrade petition in accordance with governing law and binding Department of Defense guidance." Del Toro opposed and cross-moved for summary judgment. The district court held that "under [its] 'unusually deferential' review, '"substantial evidence" of "probable material error or injustice,"'" and therefore upheld the Board's decision. Taylor v. Phelan, No. 24-CV-11479-PBS, 2025 WL 2371299, at *6 (D. Mass. Aug. 14, 2025) (quoting Mahoney v. Del Toro, 99 F.4th 25, 34 n.2, 35 (1st Cir. 2024)). The court denied Taylor's motion and granted Del Toro's cross motion. Id. Taylor timely appealed.

## IV.

### A.

We begin with Taylor's contention that "the District Court abdicated its responsibility to set aside arbitrary and capricious agency action by reviewing [Taylor's] claims through an 'unusually deferential' standard that has no application here."

The parties agree that, under the APA, a court may set aside a BCNR decision if that decision is "arbitrary, capricious,

- 15 -

an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or if the decision is "unsupported by substantial evidence," id. § 706(2)(E). This court reviews the administrative record de novo, focusing on the Board's decision and "afford[ing] no special deference to the district court's determination[]." Sasen v. Spencer, 879 F.3d 354, 360 (1st Cir. 2018).

The parties also agree that courts -- including this court -- have consistently held that BCNR decisions are typically entitled to "unusual" deference, in the sense that "[i]t is simply more difficult to say that the Secretary has acted arbitrarily if he is authorized to act 'when he considers it necessary to correct an error or remove an injustice' . . . than it is if he is required to act whenever a court determines that certain objective conditions are met." Kreis v. Sec'y of Air Force, 866 F.2d 1508, 1514 (D.C. Cir. 1989) ("Kreis I"); see Mahoney, 99 F.4th at 34; Bolton v. Dep't of the Navy Bd. for Corr. of Naval Recs., 914 F.3d 401, 407 (6th Cir. 2019) (reviewing the decision of a military board under "an unusually deferential application of the 'arbitrary or capricious' standard"); Williams v. Wynne, 533 F.3d 360, 368 (5th Cir. 2008) (reviewing a military board judgment under an "exceptionally deferential" standard). Taylor argues, however, that the "unusually deferential" standard applies only in "narrow and circumscribed" circumstances. In his view, courts owe such

- 16 -

deference only when the Board makes a "forward-looking, subjective assessment," not when it makes an "'objective,' backward-looking evidentiary determination of actual 'error' or 'injustice' in the records themselves" (quoting Kreis I, 866 F.2d at 1514).

We reject that distinction as inconsistent with the text of the Board's governing statute. Our holding in Mahoney rested on that text, which provides that the Secretary of the Navy "may correct any military record of [the Navy] when [he] considers it necessary to correct an error or remove an injustice," 10 U.S.C. § 1552(a)(1) (emphasis added). See Mahoney, 99 F.4th at 34. We expressly agreed with the D.C. Circuit that this language "substantially restrict[s] the authority of the reviewing court to upset the Secretary's determination." Id. (quoting Kreis I, 866 F.2d at 1514). The text of the statute does not condition the Secretary's broad authority on whether or not a particular case involves a forward-looking determination of necessity or a backward-looking determination of whether error or injustice occurred.

The D.C. Circuit's decision in Cone v. Caldera, which Taylor cites in his briefing, illustrates why the "unusually deferential application of the 'arbitrary or capricious' standard" applies here. 223 F.3d 789, 793 (D.C. Cir. 2000) (quoting Kreis I, 866 F.2d at 1514). Cone, a former captain in the United States Army, challenged the Army's refusal to amend his Officer Evaluation

- 17 -

Report, arguing that his senior rater had failed to maintain a rating profile that approximated a bell-shaped curve. Id. at 790-92. The D.C. Circuit applied the "unusually deferential application of the 'arbitrary and capricious' standard" of the APA. Id. at 793 (quoting Kreis I, 866 F.2d at 1514). The court explained that, in reviewing the decisions of a military correction board, that standard "is calculated to ensure that the courts do not become a forum for appeals by every soldier dissatisfied" with military action against him, "a result that would destabilize military command and take the judiciary far afield of its area of competence." Id. That reasoning applies with equal force here. The BCNR was charged with determining whether Taylor had demonstrated an error or injustice warranting correction of his service characterization. Like Cone, Taylor seeks judicial review of a correction board's refusal to alter a military record. Nothing removes Taylor's case from the Secretary's broad discretion granted by 10 U.S.C. § 1552(a), to which we apply unusual deference.

Moreover, even if the "unusually deferential" application of the arbitrary and capricious standard of review applied only where "military judgment requiring military expertise" is involved, Kreis v. Sec'y of Air Force, 406 F.3d 684, 686 (D.C. Cir. 2005) ("Kreis II"), the Board's determination here involved such judgment. Unlike Kreis II, which concerned "the

Board's application of a procedural regulation governing its case adjudication process," id., this case involved the BCNR's assessment of whether Taylor's serious misconduct, including assault on his fellow service members and driving on base after his driving privileges had been suspended following a DUI arrest, affected "the good order and discipline of [his] command," "pose[d] an unnecessary risk to the safety of fellow service members," and "render[ed] [him] unfit for" further service. The Board is empowered to consider whether such misconduct interferes with discipline, the operation of a military installation, and the safety of fellow soldiers, and that assessment is the type of military judgment to which unusually deferential review applies. See Mahoney, 99 F.4th at 41; Cone, 223 F.3d at 793-95.

**B.**

Turning to the merits, Taylor's next argument is that "the [district court] erred in concluding that the Board gave [his] application the 'liberal' and 'special' consideration" mandated by the Hagel, Kurta, and Wilkie memoranda. On de novo review, and giving unusual deference to the Board, we see no basis to upset the Board's decision.

Taylor's argument that "the Board failed to give liberal and special consideration to the question of whether [his] PTSD and major depression existed during his military service" is undercut by the essential components of the Board's decision

- 19 -

letter. In accordance with the Kurta Memorandum, the Board did not ignore or dispute the existence of Taylor's post-service PTSD and major depressive disorder diagnoses. It "carefully considered" Taylor's "contention that [he was] struggling with undiagnosed mental health issues caused by racial harassment," as well as "the impact that [his] mental health had on [his] conduct during service" and his "assertion that [he was] self-medicating with alcohol." The Board quoted from Dr. Summers's evaluation, including her conclusion that there existed "post-service evidence to attribute some of [Taylor's] misconduct to symptoms of PTSD or another mental health condition" (emphasis added). The Board took into account Taylor's diagnoses, as well as the evidence linking them to Taylor's military service.

The Board concluded, based on the record evidence before it, that Taylor's diagnoses did not account for or mitigate all of the misconduct underlying his discharge. The relevant memoranda instruct the BCNR to engage in precisely this exercise. The Hagel Memorandum states that "Correction Boards will exercise caution in weighing evidence of mitigation in cases in which serious misconduct precipitated a discharge with a characterization of service of under other than honorable conditions," and the Kurta Memorandum clarifies that "[i]n some cases, the severity of misconduct may outweigh any mitigation from mental health conditions, including PTSD." Applying this guidance, the Board

found that Taylor's serious misconduct -- including, as mentioned, assault and DUI-related driving misconduct -- outweighed the mitigating factors he presented, including his post-service mental health diagnoses, which the Board accepted, and evidence linking those diagnoses to his military service.

The Board did state that Taylor's diagnoses were "temporally remote" to his service and noted that he did not raise mental health concerns at the time that he was disciplined. Read alone, this statement appears in tension with the Hagel Memorandum's instruction that "in cases where Service records . . . substantiate the existence of one or more symptoms of what is now recognized as PTSD or a PTSD-related condition during the time of service, liberal consideration will be given to finding that PTSD existed at the time of service." See also Kurta Memorandum at 2 ("A diagnosis made by a licensed psychiatrist or psychologist that the condition existed during military service will receive liberal consideration."). Read in the context of the full decision, however, the Board did not discount Taylor's post-service diagnosis and did not treat the lack of an in-service diagnosis as dispositive. The Board discussed both Dr. Dixon's and Dr. Summers's reports and stated that it "gave liberal and special consideration to [Taylor's] . . . contentions about mental health and the possible adverse impact [his] mental health had on [his] conduct during service." The Board further explained that,

- 21 -

notwithstanding these diagnoses, the record evidence did not establish that Taylor's PTSD accounted for or mitigated all of the serious misconduct underlying his discharge or outweighed the seriousness of that misconduct. In particular, the Board emphasized Taylor's "driving while in a suspended status after being arrested for DUI and totaling [his] car," indicating that it viewed this misconduct as "intentional conduct" rendering him "unfit for further service." Thus, it appears that the Board did not disregard Taylor's PTSD but instead simply concluded that conduct not attributable to PTSD justified his discharge characterization. The Board also took into account Taylor's contention, as supported by the psychologists' evaluations, that his in-service alcohol use was an attempt to self-medicate his PTSD symptoms. With this context and applying the "unusually deferential" standard of review, the Board's "temporally remote" remark does not discount Taylor's diagnoses and does not warrant remand to the Board for reconsideration.

## C.

Taylor next contends that the "district court erred in concluding that the Board engaged in reasoned decisionmaking." On de novo review, we agree that the Board's decision was "'supported by a[] rational view of the record' and was reasonably 'based on a consideration of the relevant factors.'" Mahoney, 99 F.4th at 36 (alteration in original) (citations omitted) (first quoting

<u>Atieh</u> v. <u>Riordan</u>, 797 F.3d 135, 138 (1st Cir. 2015); and then quoting <u>U.S. Dep't of the Interior</u> v. <u>Fed. Energy Regul. Comm'n</u>, 876 F.3d 360, 368 (1st Cir. 2015)).  The Board explained that it took into account the mitigating factors presented in the record and weighed those factors against the seriousness of Taylor's misconduct, including the "likely negative impact [Taylor's] conduct had on the good order and discipline of [his] command" and the "unnecessary risk" posed "to the safety of fellow service members."  The Board reasonably concluded that "given the totality of the circumstances," a service characterization upgrade was unwarranted.

We further reject Taylor's contention that the Board failed to adequately consider his other mitigating conduct, including his graduation as platoon Honorman and his strong performance in Alpha Company.  An agency board "is not required to 'discuss every piece of evidence offered,'" provided that it takes into account "all relevant evidence in the record."  <u>Khanal</u> v. <u>Blanche</u>, 168 F.4th 1, 9 (1st Cir. 2026) (emphasis omitted) (quoting <u>Aguilar-Escoto</u> v. <u>Sessions</u>, 874 F.3d 334, 337 (1st Cir. 2017)). And the Board did explicitly consider the fact that "all of [Taylor's] misconduct in-service occurred while [he was] assigned to Charlie Company, where [he] suffered racial harassment."  The Board's decision letter further stated that it considered the entire administrative record before it, including letters

- 23 -

submitted in support of Taylor's character and "documentation related to [his] post-service accomplishments." Contrary to Taylor's argument, the Board did not "turn a blind eye" to the mitigating evidence in Taylor's favor.

Taylor is also incorrect that the Board misapplied its precedent. While an agency "must respect its own precedent," Mendez-Barrera v. Holder, 602 F.3d 21, 26 (1st Cir. 2010), so long as it "'has given reasoned consideration to the petition, and made adequate findings,' it is not required to 'expressly parse or refute on the record each individual argument or piece of evidence offered by the petitioner,'" H.H. v. Garland, 52 F.4th 8, 23 (1st Cir. 2022) (quoting Wei Guang Wang v. B.I.A., 437 F.3d 270, 275 (2d Cir. 2006)). In his application for correction of his military records below, Taylor attached a copy of a prior case, Docket No. 1542-05, where the Board had corrected the record of a Marine who had suffered racial discrimination and had been "disciplined for a series of relatively minor transgressions." After explicitly stating that it had "considered" Taylor's "application together with all material submitted in support thereof," the Board declined to correct Taylor's record due to the "seriousness of [his] misconduct." We do not consider the Board to have "depart[ed] significantly from its own precedent" in reaching a different outcome in Taylor's case, where it clearly did not consider his misconduct to be minor. Lafortune v. Garland, 110 F.4th 426, 434

(1st Cir. 2024) (quoting Thompson v. Barr, 959 F.3d 476, 484 (1st Cir. 2020)).  Rather, when confronted with these materially different cases, the Board was under no requirement to "confront the issue [of its precedent] squarely and explain why [its] departure [was] reasonable."  Id. (quoting Thompson, 959 F.3d at 484).

## V.

While others might have concluded that an equitable remedy was appropriate -- particularly in light of Taylor's evidence that the racial discrimination he suffered at Camp Pendleton caused his PTSD, which in turn contributed partly to his Other Than Honorable discharge -- we must give unusual deference to the BCNR's contrary conclusion.  Because the Board's "decision is supported by [a] rational view of the record," we as the "reviewing court must uphold it" and "may not substitute [our] judgment for that of the [Board]."  Atieh, 797 F.3d at 138.  The district court's decision is **affirmed**.